# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GARY ARMSTRONG,

                              Plaintiff,

          vs.                                   **Case No. 03-C-581**
                                                **(Lead Case)**

CITY OF MILWAUKEE,
DEPARTMENT OF NEIGHBORHOOD SERVICES,

                              Defendants.

---

GARY ARMSTRONG,

                              Plaintiff,

          vs.                                   **Case No. 04-C-751**
                                                **(Consolidated with**
                                               **Case No. 03-C-581)**

CITY OF MILWAUKEE,
DEPARTMENT OF NEIGHBORHOOD SERVICES,

                              Defendants.

---

## DECISION AND ORDER

Plaintiff Gary Armstrong ("Armstrong"), an African American male and a longtime employee of the City of Milwaukee ("Milwaukee"), filed the above-captioned actions[1] against

---

[1]For ease of reference, the actions are referred to by their case number; e.g., the "03-C-581 action."

defendants Milwaukee and its Department of Neighborhood Services ("Neighborhood Services" or the "Department") (collectively referred to as the "Defendants") alleging violations of his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

The 03-C-581 action alleges that the Defendants discriminated against Armstrong based on his race by denying him promotions in December 2000 and January 2001. Instead of selecting Armstrong for those positions, the Defendants selected a white male, Peter Skiba ("Skiba"), in December 2000 as Housing Rehabilitation Specialist and a white female, Karen Jacobs ("Jacobs"), in January 2001 as Assistant Supervisor for Code Enforcement – Commercial.[2] Armstrong also alleges that the Defendants retaliated against him for engaging in protected activity by disciplining him more harshly than a white female co-worker, Julie Blosmore ("Blosmore"), for engaging in an altercation.

The 04-C-751 action alleges that the Defendants discriminated against Armstrong based on his race in April of 2003 by denying him the position of Building Construction Inspection Assistant Supervisor for Condemnation Services and, instead, selecting a Caucasian male, Chris Kraco ("Kraco"), for the position. In the 04-C-751 action, Armstrong also claims that in late 2002 or early 2003 the Defendants discriminated against him based on his race by limiting the applicant pool for the position of Commercial Code Enforcement Supervisor to assistant supervisors.

---

[2]The complaint in the 03-C-581 action does not allege any sex discrimination against Armstrong.

In addition, the 04-C-751 action alleges that the Defendants unlawfully retaliated against Armstrong for engaging in protected conduct by disciplining him for inappropriate use of the work e-mail system, whereas other non-minority employees who acted similarly were not disciplined. Armstrong also alleges retaliation in that he was subjected to greater scrutiny at work, than his co-workers who had not filed complaints of discrimination, and that he was warned and counseled about conduct which was acceptable for other Neighborhood Services's employees. The 04-C-751 action also alleges that the Defendants' conduct created a hostile work environment for Armstrong based on his race and in retaliation for his participation in protected activity.

At the request of the parties, the Court consolidated the two actions. The Defendants' motion for summary judgment requesting dismissal of these actions will now be addressed.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also

–3–

citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Cunningham*, 30 F.3d at 883. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (citations omitted).

## II. PRELIMINARY EVIDENTIARY ISSUES

The Defendants have raised two preliminary evidentiary challenges. First, the Defendants assert that many of Armstrong's claims are time-barred and that he has failed to meet conditions precedent to filing suit in federal court. Armstrong, while conceding that four of the alleged discriminatory acts were not raised in timely-filed administrative discrimination charges, asserts that he may rely upon those four acts as evidence of the Defendants' pattern of "non-

selection and bias" that surround Armstrong's efforts to professionally advance within the Department. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. 1-2 n.1.)

Second, the Defendants contend that statistical evidence proffered by Armstrong is not admissible. Armstrong has not responded to the challenge.

### A. Evidence of Past "Untimely" Acts

Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, requires that a charge of discrimination be filed with the EEOC within 180 days "after the alleged unlawful employment practice occurred." *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002) (quoting 42 U.S.C. § 2000e-5(e)(1) (2002)). A discrete retaliatory or discriminatory act "occurred" on the day that it "happened." *Tinner*, 308 F.3d at 707 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)).

The statute extends the 180-day time period for the filing of the charge to 300 days when the aggrieved person initially institutes proceedings with a state or local agency that has the power to grant relief in the situation. *Id.* A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it. *Id.*

However, the existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the later acts are independently discriminatory and charges addressing those acts are themselves timely filed. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim. *Id.*

Case 2:03-cv-00581-RTR   Filed 11/17/05   Page 5 of 53   Document 55

Armstrong did not file timely administrative discrimination claims regarding the following promotions: (1) Vector Nuisance Control Manager on August 27, 1999; (2) Commercial Code Enforcement Supervisor on August 27, 1999; (3) Vector Nuisance Control Supervisor on March 8, 2000; and, (4) Program Manager on May 1, 2000. However, the evidence about these four untimely alleged acts of discrimination is admissible as background evidence of Armstrong's timely claims of discrimination and therefore will be included in the Court's statement of the relevant facts. *See Id.*

## B. Statistical Evidence

Second, the Defendants challenge the admissibility of the statistical evidence proffered by Armstrong. "In conjunction with other evidence of disparate treatment . . . statistics can be probative of whether the alleged disparity is the result of discrimination." *Bell v. E.P.A.*, 232 F.3d 546, 552 -53 (7th Cir. 2000) (citing *Kidd v. Ill. State Police*, 167 F.3d 1084, 1101 n.16 (7th Cir. 1999)).

Armstrong proffers a proposed finding of fact which states:

Melanie Swank wrote notes giving a "snap shot" of the racial makeup of the inspection unit. Those notes indicate that there were [sic] a total of 82 inspectors, with 18 of those 82 being African American. There were [sic] a total of 17 management employees, with two of those 17 being African American.

(Pl.'s Resp. to Defs.' Proposed Findings of Fact ("PFOF") and Pl.'s Add'l PFOF, ¶ 367.) The Defendants state that Melanie Swank ("Swank") did not make such a finding and the record does not support such a statement. Further, they question Armstrong's introductory description of an

"inspection unit," and state that Armstrong has failed to name an expert witness to provide testimony about statistics or applicant flow data. (Defs.' Resp. to Pl.'s PFOF, ¶ 367.)

Armstrong's proposed finding is based on the first page of notes taken by Melanie Swank ("Swank") as a part of her investigation into the internal employee discrimination complaint that Armstrong filed with Milwaukee in May 2001. These notes reflect Swank's "own picture" of the Department's racial makeup. (Manlove Aff. ¶ 6, Ex. C (Swank Dep.) at 16 and 0394.) While there is no indication that a specific "inspection unit" existed, Swank's handwritten list of inspectors, her tabulation of the race and gender of those inspectors and her deposition testimony, as cited by Armstrong, provide factual support for the second sentence of Armstrong's proposed finding of fact. Such evidence is, at best, of marginal relevance to Armstrong's failure-to-promote claims, but will be considered as background evidence.

Armstrong attempts to use such evidence as a basis for his pretext argument.[3] Though a *prima facie* case of discrimination is the condition precedent to the pretext analysis and should not be bypassed, *see Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 273 (7th Cir. 2004), Armstrong's use of statistics raises an evidentiary issue, which the Court now addresses.

Based on Swank's figures that 18 of 82 inspectors were African American, Armstrong argues that there was a "participation rate" of 22%. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. 15.) He further argues that management exhibited a "participation rate" of 11% because only two out of 17 managers were African Americans. *Id.* Armstrong states that "this

---

[3] The court of appeals has found statistical evidence to be admissible and helpful in disparate treatment cases, though statistical evidence alone does not in most cases prove pretext. *Guerrero v. Ashcroft*, 253 F.3d 309, 315-16 (7th Cir. 2001) (citing *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553 (7th Cir.2001); *Adams v. Ameritech Serv., Inc.*, 231 F.3d 414, 423 (7th Cir. 2000).)

type of pattern and disparity" is clear evidence of discriminatory practices, conscious or unconscious, and of disparate impact against African Americans.[4]  *Id.*

Somewhat analogous evidence was discussed in *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (7th Cir. 2002).  In *Millbrook*, a failure-to-promote case that went to trial, the court of appeals discussed the plaintiff's attempt to establish pretext by pointing out that no African Americans were hired during a two-year time frame.  280 F.3d at 1177.  The court stated that such evidence was "at best anecdotal," and it had held that it could not find discrimination on such a "thin basis."  *Id.*  (quoting *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir.1996).) The court stated that its "opinions emphasize the need to get beyond a few comparison cases" and that "what a plaintiff . . . in [such] position has to do is subject all of the employer's decisions to statistical analysis to find out whether race makes a difference." *Id.*

Here, Armstrong has not presented a statistical analysis or proffered expert analysis of statistics.  Rather, he simply identifies the percentage of African American inspectors and the percentage of African American supervisors working in Neighborhood Service at a given time. Absent context, these percentages and numbers have little import.  Without knowing how many

_____

[4]In this portion of his brief, Armstrong is indiscriminately commingling various theories of recovery. For example, to establish a *prima facie* case of disparate impact, a plaintiff first must "isolate and identify 'the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Bennett v. Roberts*, 295 F.3d 687, 698 (7th Cir. 2002) (quoting *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996) (quoting *Watson*, 487 U.S. at 994). Isolated and singular incidents generally are insufficient to constitute a specific employment practice. *See, e.g., Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1156 (7th Cir.1997). Second, the plaintiff must establish a causal connection between the employment practice and the statistical disparity, offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group." *Vitug*, 88 F.3d at 513.

In a pattern and practice disparate treatment case, statistical evidence constitutes the core of a plaintiff's *prima facie* case. *Bell*, 232 F.3d at 553. Within the *McDonnell Douglas* individual disparate treatment model, however, statistical evidence is only one small part of a substantial web of evidence indicating pretext. *Id.* Thus, evidence of "systemic disparate treatment is relevant to and probative of the issue of pretext even when it is insufficient to support a pattern and practice disparate treatment case." *Id.*

of the inspector positions or the supervisory positions became available in Neighborhood Services during that time frame, the number and race of the candidates applying for those positions, and the candidates' relative qualifications, "[s]uch a list is next to worthless." *See Id.* The percentages of African American inspectors and supervisors in 2001, absent more, fails to create a reasonable inference that Milwaukee's reasons for promoting other candidates are fabricated or pretextual. *See Id.*

Armstrong also proffers a proposed finding of fact that states: "Within the entire Department of Neighborhood Services there are approximately 185 employees, of which 43 are African American. There are two African American employees within the supervisor level, and no African American employee above the supervisory level." (Pl.'s Resp. to Defs.' PFOF and Pl.'s PFOF, ¶ 368.) The Defendants state that this proposed fact is vague as to time and is not relevant or material.

This proposed finding of fact is based on pages 52 through 57 of the transcript of Collins's deposition testimony and Exhibit 26 from Collins's deposition, which indicate that the source of such statistics is an August 30, 2004, listing of Department employees and their "ethnic group[s]." (Manlove Aff. ¶ 7, Ex. D at 53 & Ex. 26.) The proposed finding of fact is of some relevance as background information because it provides an indication of the number of African Americans working in Neighborhood Services and those who held supervisory positions in August 2004. However, to provide context, the Court will supplement the statement with the time period reflected by the statistics.

## III. RELEVANT FACTS[5]

### A. Background

Milwaukee, a Wisconsin municipal corporation, (Compl. 03-C-0581 ¶ 2, Ans. 03-C-0751 ¶ 2; Compl. 04-C-0751 ¶ 2, Ans. 04-C-0751 ¶ 2), is an Equal Opportunity Employer. Neighborhood Services is a city department that was formed in 1999 by the merger of portions of the Health Department, the Department of City Development and the Department of Building Inspection ("Building Inspection"). Neighborhood Services is comprised of six divisions: (1) Information and Technology; (2) Support Services; (3) Construction Trades; (4) Commercial Inspection; (5) Residential Inspection; and (6) Nuisance and Environmental Health. Responsible for inspecting residential and commercial property within city confines (Compl. 03-C-0581 ¶ 3, Ans. 03-C-0751 ¶ 3; Compl. 04-C-0751 ¶ 3, Ans. 04-C-0751 ¶ 3), Neighborhood Services oversees citywide zoning, code enforcement and compliance, condemnation, building, construction, fire safety, graffiti, nuisances, environmental issues, and neighborhood funding. Martin Collins ("Collins") is the Commissioner of Neighborhood Services.

Armstrong has a bachelor's degree in business administration with a focus in finance from the University of Wisconsin – Milwaukee and has State of Wisconsin certificates in Commercial Building Inspection, Uniform Dwelling Code, and Fire. As of August 3, 2005, Armstrong was president of his union and, before that, was a union steward.

---

[5]Unless otherwise noted, the following facts are based upon the Defendants' proposed findings of fact and the Plaintiff's Additional Proposed Findings of Fact to the extent they are undisputed. Citations to all quoted material are provided, even though such facts are undisputed.

Armstrong was initially hired by Milwaukee in 1977 as a Building Maintenance Inspector Intern in Building Inspection, a city department responsible for inspecting of residential and commercial properties in the city.[6]  Armstrong worked as a Building Inspector/Code Enforcement Inspector from April 1977 to February 1997.[7]  Armstrong was promoted to the position of Special Enforcement Inspector in February 1997.  At all material times, Armstrong was employed by Milwaukee; Neighborhood Services was never Armstrong's employer. Armstrong has never been employed by Milwaukee in a supervisor's position.[8]

### B. Swank Investigation -2001

In May 2001, Armstrong filed an employment complaint with Milwaukee's Department of Employee Relations ("Employee Relations"), claiming that he did not receive promotions at Neighborhood Services because of his race and sex.  Armstrong did not complain about a hostile work environment or harassment.

Swank, an attorney who transferred from a position as an assistant city attorney to Employee Relations in January 1998, served as some human resources representative until

---

[6]In the affidavit, Armstrong avers that he "considers" Neighborhood Services to be his employer.  (*See* Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF ¶ 10.)  Armstrong's perception of Neighborhood Services as his employer does not create a genuine issue of fact as to the identity of his employer.  *See* Fed. R. Civ. P. 56(e).  *See Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir.1987) (finding that the plaintiffs' statements regarding what they "felt to be the case" were not admissible evidence in opposition to a motion for summary judgment).

[7]This statement is based on Defs.' PFOF ¶ 11, which is undisputed.  However, the Court has revised the statement to indicate that Armstrong's position as a Building/Code Enforcement Inspector ended in February **1997,** rather than February **1993** as stated in PFOF ¶ 11.  This revision is consistent with the underlying factual material.  *See* Collins Aff. ¶ 3 (incorrectly cited as Collins Aff. ¶ 2 in Defs.' PFOF ¶ 11).

[8]Armstrong avers that, upon request, he has substituted for supervisors and assistant supervisors.  (Armstrong Aff. ¶ 5.)  Such averment does not raise a factual dispute as to Milwaukee's assertion that Armstrong has never been employed by Milwaukee as a supervisor.  While Armstrong has not consistently raised objections to proposed findings of fact regarding his purported lack of supervisory experience, the Court has presumed a continuing objection has been maintained by Armstrong to avoid confusion and inconsistency.

November 2001. (Swank Aff. ¶ 1.) Swank's duties included investigating complaints of discrimination and harassment filed by City employees. (*Id*. at ¶ 2.)

Swank wrote notes giving her own picture of the racial makeup of the Neighborhood Services. (Manlove Aff. ¶ 6, Ex. C at 16 and 0394.) Swank's notes indicate that there were 82 inspectors, 18 of whom were African American. (Manlove Aff. ¶ 6, Ex. C at 0394.) There were 17 management employees, with two of those being African American. (*Id*.)

After conducting an investigation, Swank concluded that there was no evidence of race discrimination or preferential treatment in the promotional procedures and that Armstrong's complaint lacked merit. On about May 24, 2001, Swank advised Armstrong of her initial conclusion and that he should forward to her any additional information he thought should be considered.

Swank interviewed all of the decision makers and attempted to interview all of the persons with whom Armstrong asked her to speak. From the decision makers, Swank determined that, with respect to each disputed position, Armstrong was not promoted for consistent legitimate nondiscriminatory business reasons and that the promotion procedures complied with the Civil Service Rules.

Swank concluded that during each interview, members of the interview panel asked the same questions of each candidate and that Armstrong never achieved the top score and, after being interviewed, he was never recommended for the position. Each management employee interviewed by Swank stated that Armstrong showed a lack of initiative that was incompatible with the supervisory positions he sought, which required a very assertive person. Additionally,

many of the panel members reported that, during Armstrong's interviews, he did not engage in eye contact and provided very brief responses to questions. Swank determined that the other key factor in the decision-making process was that Armstrong's expertise was not as expansive as the chosen candidate and that the chosen candidate also possessed supervisory experience.

In June 2001, Armstrong sent Swank a letter naming an additional 23 people that he wanted her to interview. At about that time, Swank was also assigned to investigate the employment complaint of another Neighborhood Services employee, Melinda Sallis ("Sallis"), who complained that she was being treated disrespectfully.

Swank interviewed or attempted to interview the additional 23 people named by Armstrong. Swank also investigated Sallis' complaint and she asked some people questions about both Armstrong and Sallis.

### C. Administrative Charges

On about May 1, 2001, Armstrong filed United States Equal Employment Opportunity Commission ("EEOC") Charge No. 260A10758, cross-filed with the State of Wisconsin Equal Rights Division ("ERD") as Charge No. 200101509 (collectively referred to as "May 2001 Charges"). The May 2001 Charges alleged that Armstrong was denied six promotions[9] because of his gender and race:

(1) Vector Nuisance Control Manager on August 27, 1999;

(2) Commercial Code Enforcement Supervisor on August 27, 1999;

(3) Vector Nuisance Control Supervisor on March 8, 2000;

---

[9]Each listed date is the date that Armstrong learned that he did not receive the position.

Case 2:03-cv-00581-RTR   Filed 11/17/05   Page 13 of 53   Document 55

(4) Program Manager on May 1, 2000;

(5) Housing Rehabilitation Specialist, Senior on December 14, 2000; and,

(6) Program Assistant Supervisor-Commercial Code Enforcement on January 18, 2001.

The EEOC dismissed Charge No. 260A10758 and issued a Right to Sue notice on about April 5, 2003.

The ERD issued a Preliminary Determination on November 29, 2001, dismissing allegations related to four promotions (August 1999 (2) and Spring 2000 (2)) as barred by the applicable statute of limitations. Upon appeal, an Administrative Law Judge ("ALJ") concurred that the charges concerning the four positions were untimely filed. Armstrong did not appeal. The ERD dismissed the remaining two, though timely filed, failure-to-promote claims (December 2000 and January 2001), finding "no probable cause" to support a claim of discrimination.

On or about February 7, 2002, Armstrong filed ERD Charge No. 200200554, cross-filed as EEOC Charge No. 26GA200753, alleging that he received a one-day suspension on November 14, 2001, for an altercation that occurred on November 8, 2001. Armstrong claimed that this discipline was issued in retaliation for his previously filed discrimination charges. On May 21, 2002, the ERD dismissed the matter on a finding of "no probable cause." On March 22, 2003, the EEOC dismissed the matter and issued a Right to Sue notice.

On about September 23, 2003, Armstrong filed another charge with the ERD (Charge No. 200303729) and the EEOC (Charge No. 26G-2003-02076) claiming that he had not been promoted to two positions because of his race and in retaliation for filing previous charges.

-14-

Specifically, Armstrong alleged that he had been passed over for the positions of Commercial Supervisor in early 2003, and Building Construction Inspection Assistant Supervisor in April 2003. He also claimed that on March 17, 2003, he was given a warning for inappropriately using Milwaukee's e-mail system. Armstrong viewed this warning as retaliation for filing his prior discrimination charge. The ERD dismissed Charge No. 200303729 on March 16, 2004, based on a finding of no probable cause. The EEOC issued a dismissal on Charge No. 1 26G-2003-02076 and a Right to Sue notice dated May 11, 2004.

### D. Promotions Outside the Statute of Limitations

Armstrong alleges that because of racial discrimination he did not receive the following four promotions: (1) Vector and Nuisance Control Manager on August 27, 1999; (2) Code Enforcement Commercial Supervisor on August 27, 1999; (3) Vector and Nuisance Control Supervisor on March 8, 2000; and, Program Manager Specialist on May 1, 2000.[10] The May 2001 Charges regarding these four positions were untimely.

### 1. Vector Nuisance Control Manager

Armstrong claims that he should have been promoted to the position of Vector Nuisance Control Manager in August 1999 because he possessed both the qualifications and experience for that position. However, he believes that he was denied the position because of his race. Armstrong states that his application was misplaced or graded separately from the other applications.

---

[10]Each date is the date that Armstrong learned he did not receive the position.

The Vector Nuisance Control Manager oversees the Nuisance and Environmental Health Division, which has approximately 41 employees. The Nuisance Control (approximately 24 employees) and the Environmental Health (approximately 17 employees) sections comprise the Nuisance and Environmental Health Division.

Pursuant to Civil Service Rule VIII, Neighborhood Services held a competitive examination in August 1999 for the Vector Nuisance Control Manager position. According to that Rule, the hiring department must select from the top five individuals on the certified eligibility list when filling managerial positions through a competitive examination process.

On August 23, 1999, Armstrong submitted a timely application and a separate Training and Experience Questionnaire to Employee Relations. The promotion examination consisted of a training and experience rating which translated into a final numerical score, based upon an average of the evaluations of four independent raters. On August 25, 1999, four independent raters evaluated all of the applicants' applications and questionnaires. Armstrong's application was not rated separately from the applications of the other candidates.

Employee Relations employee, Charles Coleman ("Coleman"), supervised the rating process and calculated all the scores. In accordance with City Service Rules, the candidates were ranked based upon their respective scores and an eligibility list was certified. For the Vector Nuisance Control Manager position, Armstrong received a score of 80.25 and ranked sixth.

Neighborhood Services did not invite Armstrong to interview for the position because he was not among the top five candidates on the certified eligibility list. Neighborhood

-16-

Services interviewed the top five candidates, and chose David Krey ("Krey"), a Caucasian male, one of the top five candidates. Krey has a bachelor's degree in chemistry and approximately 20 years of related professional experience with Milwaukee, including approximately 11 years as a supervisor. Krey is a registered Sanitarian and a registered Industrial Hygienist and holds several other relevant certifications. Krey's training and experience in the area of environmental health made him an excellent candidate for the position.

Armstrong does not know if he was more qualified than Krey, but believes that he had the qualifications and experience for that position. Armstrong did not have any registration or certification in sanitation or as an Environmental Health Specialist. Armstrong did not have a bachelor of science degree in natural or biological health sciences.

### 2. Commercial Code Enforcement Supervisor

Armstrong also claims he should have obtained the Commercial Code Enforcement Supervisor position in August 1999. Armstrong believes that because of his race, his application for Commercial Code Enforcement Supervisor was misplaced or graded separately from those of the other applicants.

The Commercial Code Enforcement Supervisor is responsible for supervising about 31 employees and for the oversight of three sections: (1) the Commercial Code Enforcement Section which has 18 inspectors and two assistant supervisors who are responsible for annual fire safety inspections for approximately 9,200 commercial buildings in Milwaukee; section inspectors also respond to complaints and perform maintenance inspections for the commercial buildings; (2) the Condemnation Section which has three building construction inspectors who

conduct inspections of properties for possible condemnation actions, for all demolition permits, and for any construction repair permits related to condemned buildings; and, (3) the Zoning Section, in which there are four special enforcement inspectors, who respond to and enforce the zoning code for all complaints of zoning violations, and an assistant supervisor who directly supervises the section.

Like the other August 1999 promotion, the Commercial Code Enforcement Supervisor position was filled following the previously identified procedure pursuant to Civil Service Rule VIII. Armstrong submitted a timely application and a separate Training and Experience Questionnaire to Employee Relations on August 23, 1999. The promotion examination for the position consisted of a training and experience rating which comprised a final score. On August 25, 1999, four independent raters evaluated all the applicants' applications and questionnaires, including those of Armstrong. Armstrong's application was not rated separately from the applications of the other candidates. Coleman supervised the rating process and computed all the scores. On the Code Enforcement Inspection Supervisor rating, Armstrong received a score of 79.00 out of a possible 100, and ranked seventh among the candidates.

The Department chose Tracy Williams ("Williams"), a Caucasian female, who ranked in the top five candidates as the Commercial Code Enforcement Supervisor. She has a bachelor's degree in architecture. Williams possesses state Commercial and Uniformed Dwelling Code Certifications. Prior to her appointment as supervisor, Williams was the Assistant Supervisor in the Condemnation Section for two years. For approximately eight years before that,

she worked as Building Plan Examiner with Neighborhood Services. Even earlier, Williams held

the position of the Development Director of the Walker's Point[11] Development Corporation.

Armstrong never served as an assistant supervisor or supervisor at Neighborhood

Services.[12] Armstrong believes that he was more qualified for the position than Williams.

Armstrong does not have a degree in architecture.

### 3. Vector Nuisance Control Supervisor

Armstrong also claims that in March 2000, he should have been selected as the

Vector Nuisance Control Supervisor. The Vector Nuisance Control Supervisor is responsible

for supervising the work of approximately ten Vector Nuisance Control Officers in the Nuisance

Control Section. The Nuisance Control Section safeguards environment health by enforcing both

the city and state codes regulating garbage nuisance, abandoned/nuisance vehicles, and

rodent/pest infestations.

The position of Vector Nuisance Control Supervisor was filled in March 2000

under Civil Service Rule IV-9 without a competitive examination process; Armstrong was

interviewed for the position, but Jim Igowski ("Igowski"), a Caucasian male, received the

promotion. Igowski has a bachelor's degree in biology and Armstrong does not. At the time,

Igowski had approximately 13 years of related professional experience with Milwaukee,

---

[11]Walker's Point is a neighborhood on the south side of Milwaukee. *See* http://cityonthelake.com/neighborhoods/Walkerspoint (last visited Oct. 17, 2005).

[12]Armstrong agreed with this proposed finding of fact. (Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF at ¶ 65 through ¶ 89.)

including approximately two years as a supervisor. Igowski is a registered Sanitarian and possesses several other relevant certifications.

Armstrong believes that he was more qualified for the position than Igowski and maintains that he was not promoted because of the historical racial make-up of Neighborhood Services.

### 4. Program Manager Supervisor

Armstrong also claims he should have obtained the Program Manager Supervisor position in the Neighborhood Improvement Development Corporation ("NIDC")[13] in May 2000. The Program Manager Supervisor position oversees the loan activities of the NIDC.

That position was filled by laterally transferring Cheryl Nelsen ("Nelsen"). Prior to the transfer, Nelsen was the NIDC Fiscal Officer, a position at the same level as Program Manager Supervisor.

Armstrong was not eligible for the position because in 2000 he held the position of Special Enforcement Inspector, which was not lateral to the position of Program Manager Supervisor. Armstrong never worked on the Rental Rehabilitation Loan Committee in Neighborhood Services or as a fiscal officer. This is the last of Armstrong's untimely claims.

### E. Timely Promotions

Armstrong alleges that because of racial discrimination he did not receive the following four promotions: (1) Senior Housing Rehabilitation Specialist in December 2000; (2) Assistant Supervisor for Commercial Code Enforcement in January 2001; (3) Supervisor for

---

[13]NIDC is a federally-funded program which was overseen, in part, by Neighborhood Services in 2000.

Commercial Code Enforcement in February 2003; and, (4) Building Construction Supervisor for Condemnation Services in April 2003. The administrative charges regarding these four positions were timely filed.

*1. Senior Housing Rehabilitation Specialist Position – December 2000*

Armstrong alleges that he did not get promoted to the position of Senior Housing Rehabilitation Specialist in December 2000 because of his race. The position of Senior Housing Rehabilitation Specialist is one of several Housing Rehabilitation Specialist positions with the NIDC. The position includes "developing scopes of work" and working with homeowners and contractors to rehabilitate primarily owner-occupied homes as part of Milwaukee's federally funded housing rehabilitation program. (Defs.' PFOF ¶ 127.) The Community Development Block Grant Administration is responsible for awarding and allocating federal housing rehabilitation funds and monitoring compliance with program regulations

In December 2000, Employee Relations held a competitive examination for the position of Senior Housing Rehabilitation Specialist and forwarded a certified eligibility list to Neighborhood Services. Armstrong applied and ranked fifth on the certified eligibility list. Skiba, a Caucasian male, ranked third on the list.

In accordance with City Service Rule VIII, the Department interviewed the top five persons for the position. After the interviews, the interview panel advised Collins that Skiba performed the best. Collins agreed that Skiba was the most qualified. In late December 2000, Collins appointed Skiba to the position.

Immediately prior to his appointment as a Senior Housing Rehabilitation Specialist, Skiba had been a loan officer with the NIDC for approximately two years. Previously, Skiba worked for ten years as a Housing Monitor and Compliance Officer with the Community Development Block Grant Administration. For about three years, Skiba managed the housing rehabilitation program in Milwaukee and evaluated the applications of potential housing rehabilitation loan and grant recipients for compliance with local and federal requirements. Skiba had also owned and operated his own construction firm for three years, and managed a private nonprofit housing rehabilitation program. Skiba's prior work and his experience as a contractor correlated to functions in the Senior Housing Rehabilitation Specialist position.

Skiba had experience as a loan officer and Armstrong did not. Skiba had experience working as a contractor and Armstrong did not. Skiba had experience running his own business and Armstrong did not. Armstrong believes he was more qualified for the position.

### 2. Assistant Supervisor Commercial Code Enforcement – January 2001

Armstrong also alleges that he should have been promoted to Assistant Supervisor of Commercial Code Enforcement in January 2001. The Assistant Supervisor works directly under the Commercial Inspection Division Supervisor, and supervises approximately 18 employees as well as eight Code Enforcement Inspectors in the Commercial Inspection Section.

For managerial positions, seniority or length of service is not a consideration in the promotion process, because Neighborhood Services is interested in promoting the most qualified person for the position regardless of the employee's length of service. Neighborhood Services

considers the relevance and quality of a candidate's experience as well as the individual's performance and accomplishments.

Because the Assistant Supervisor of Commercial Code Enforcement position was an in-house promotion under Civil Service Rule IV, Sec. 9, interested persons who worked in Neighborhood Services were allowed to apply. Armstrong, Clyde Hammer ("Hammer"), Jacobs, Doug Krimmer ("Krimmer") and Tom Wessel ("Wessel") applied for the position. All of the applicants had the requisite qualifications and were interviewed by an advisory panel, which asked each applicant the same series of questions. The following persons were panel members: (1) Skip Seager ("Seager"), a Caucasian male, who was then the Chief Operations Manager; (2) Pandora Bender ("Bender"), a Black female, who was an Assistant Supervisor in the Commercial Inspection Division; (3) Joe Payne ("Payne"), a Black male, who was a non-management inspector in the Residential Division; and, (4) Williams, a Caucasian female, who was the Commercial Code Enforcement Section Supervisor. The panel was charged with recommending the most qualified candidate to Williams, the section supervisor. The panelists could take notes or assign scores to assist them in discussing the candidates' strengths and the weaknesses. One panelist's notes regarding Jacobs's interview state:

-Examples slightly relate to question
-Relies too much on policy
-Examples strays from the question
-Questionable investigation skills.

Armstrong believes he was the most qualified applicant because he had a longer tenure with the City and had more experience than Jacobs. Both Armstrong and Jacobs had served as Special Enforcement Inspectors. At the time of the interviews, both Armstrong and

Jacobs had worked as Code Enforcement Inspectors and Special Enforcement Inspectors; Jacobs had ten years experience and Armstrong had 23 years of experience in such positions. During Armstrong's interview, he was invited to elaborate on his answers, but declined.

The interview panel advised Williams that Jacobs and Krimmer had the best interviews, with Jacobs being the most desirable candidate.[14] Williams also believed that Jacobs and Krimmer had interviews that were superior to that of Armstrong.

Jacobs was invited for a second interview; there was precedent for the City to conduct a second interview with the strongest candidate before offering a promotion. At the second interview, Williams and Jacobs discussed the high level of initiative Jacobs had demonstrated in the department, two programs that she had started in Neighborhood Services, and Jacobs's vision for the department. They discussed Jacobs's development and implementation of Neighborhood Services's centralized complaint system in 1995, which involved converting from the mainframe-based complaint system to a "Micro-based system." (Defs.' PFOF ¶ 182.) Jacobs was actively involved in all phases of the process from design to final implementation. She further refined the system when Milwaukee adopted a complaint-based Habitability Ordinance in 1998, and incorporated environmental health and nuisance complaints in 1999, when Neighborhood Services was formed.

At the second interview, Jacobs discussed her development of a multi-disciplinary task force in 1995 to deal with problems relating to mentally-ill tenants and homeowners. Jacobs created a consortium of service providers to improve strategies for addressing the special needs

---

[14]Armstrong believes that the interview panel selected Jacobs for the promotion before the interviews were conducted. **Cite**

of that population. The consortium recommended a building code change that is being drafted. In 1998, Jacobs received a City Innovation Award for her work on both these programs.

Williams recommended that Jacobs be promoted to the position based upon her previous experience and the quality of her interview. Collins agreed, and promoted Jacobs.

### 3. Commercial Code Enforcement Supervisor – February 2003

Armstrong alleges that he has been discriminated against based upon his race because he was not invited to interview for the position of Neighborhood Services Commercial Code Enforcement Supervisor in February 2003. In January or February 2003, there was an internal promotional opportunity to fill the position of Commercial Code Enforcement Supervisor, which Williams had previously held. The vacancy was filled in accordance with Civil Service Rule IV, Section 9.

A notice for the position was sent to the current Neighborhood Services supervisors and assistant supervisors. Only those persons who were current Neighborhood Services assistant supervisors or held higher positions were eligible for interviews.

In late 2002 and early 2003, Armstrong held the position of Special Enforcement Inspector, which is not a supervisory position. Therefore, he was not eligible for the extant supervisory vacancy.

Every applicant was interviewed, including:

(1)     Steve Fritsche ("Fritsche"), a Caucasian male, serving as an Assistant Supervisor for Building Construction;

(2)    Ron Roberts ("Roberts"), a Black male, serving as an Assistant Supervisor for Condemnation/Zoning Enforcement;

(3)    Jacobs, a Caucasian female, serving as a Supervisor for Commercial Code Enforcement;

(4)    Mike Greylak ("Greylak"), a Caucasian male, serving as an Assistant Supervisor for Residential Code Enforcement;

(5)    Krey, a Caucasian male, serving as an Assistant Supervisor in Nuisance and Environmental Health;

(6)    Clyde Hutchinson ("Hutchinson"),[15] a Caucasian male, serving as an Assistant Supervisor in Residential Code Enforcement; and,

(7)    Bender, a Black female, serving as an Assistant Supervisor in Commercial Code Enforcement.

Collins and Williams interviewed the candidates, asking each of them the same questions about their job experiences, qualifications, and visions for the Department. Collins and Williams agreed that Roberts had the best interview. He demonstrated a thorough knowledge of the Milwaukee ordinances and the state building codes, and had extensive related experience in all sections of Neighborhood Services, particularly the Condemnation and Zoning sections.

Roberts had worked for Neighborhood Services for more than 18 years, having started as a Code Enforcement Inspector with a subsequent promotion to a Special Enforcement Inspector in the Zoning section. Thereafter, Roberts had been the Assistant Supervisor of the Residential Division. At the time of the opening for the Commercial Code Enforcement

---

[15]The Court has corrected the spelling of Hutchinson's surname to be consistent with the spelling of his surname in his affidavit. Paragraph 198 of the Defs.' PFOF erroneously spells his surname as "Hutchinsen," rather than "Hutchinson."

Supervisor position, Roberts held the position of Assistant Supervisor in the Condemnation and Zoning Enforcement sections.

Roberts met all of the requisite qualifications for the vacant position. Roberts's writing skills were excellent. He worked well with property owners, contractors, business operators and his staff. He was certified in the State Commercial building Code, UDC[16] – Construction and UDC-HVAC (Heating, Ventilation and Air Conditioning). Collins offered the promotion to Roberts and he accepted it.

### 4. Building Construction Inspection Assistant Supervisor for Condemnation Services – April 2003

In April 2003, there was an internal promotion for a Building Construction Assistant Supervisor to be filled pursuant to Civil Service Rule IV, Section 9. This Assistant Supervisor is responsible for the day-to-day administration of the Department's Condemnation and the Zoning Enforcement programs. The Building Construction Assistant Supervisor directly supervises three building construction inspectors who focus on condemning fire damaged or dilapidated/vandalized vacant buildings. The Assistant Supervisor must understand construction methods, building materials, and the condemnation process, including qualifying a building, proper service of orders, and how to inform owners of their rights. He must also understand the appellate process and possess the ability to represent Neighborhood Services in court. Additionally, this Assistant Supervisor needs to comprehend the demolition bidding process and the building construction process when condemned buildings may be repaired.

---

[16]Neither the parties' submissions nor the underlying cited factual materials disclose the meaning of the acronym "UDC."

The Assistant Supervisor supervises four Special Enforcement Inspectors who focus on zoning violations, specifically the illegal use of properties in the city. As a result, he must know the current zoning code, especially those sections pertaining to common illegal uses of properties. The Assistant Supervisor must possess good communication skills, writing skills, and should demonstrate initiative and good judgment.

Williams, Hutchinson, and Roberts interviewed Armstrong, Tom Cleary ("Cleary"), Larry Govin-Matzat ("Govin-Matzat"), Brian Kaufman ("Kaufman"), Kraco, Kirsten Stone ("Stone"), and Greg Zyckiewicz ("Zyckiewicz"). The interviewees for the position were scored and ranked. The three panelists ranked the interviewees as follows:

| Rank | Williams | Hutchinson | Robert |
|------|----------|------------|--------|
| 1. | Kraco | Kraco | Stone |
| 2. | Kaufman | Kaufman | Kaufman |
| 3. | Stone | Govin-Matzat | Kraco |
| 4. | Govin-Matzat | Stone | Govin-Matzat |
| 5. | Cleary | Armstrong | Cleary |
| 6. | Zyczkiewicz | Cleary | Armstrong |
| 7. | Armstrong | Zyckiewicz | Zyckiewicz |

After ranking the interviewees, the panel discussed the candidates' strengths and weaknesses.[17] Kraco offered insightful responses, was engaging and talkative, made eye contact. Roberts and Williams agreed that Kraco made the best showing, but Hutchinson thought Stone's

_____

[17]Armstrong proffers two numeric scores for the responses of Armstrong, Cleary, Kraco and Zyckiewicz to the first interview question. (*See* Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF, ¶¶ 361-64.) However, these facts, without more, are not relevant under Fed. R. Evid. 401; that is, they do not have the tendency to make the existence of any fact having consequence to the action more or less probable than it would be without the evidence. The Defendants were only able to locate the interview notes of two out of three panelists. (*See* Manlove Aff., Ex. B at 1.) Furthermore, 12 questions were asked of the interviewees. Thus, the scores of two of three panelists on a single question proffered by Armstrong are irrelevant.

Armstrong also proffers the answers provided to the first question by Cleary and Zyckiewicz. These responses are also irrelevant under Fed. R. Evid. 401 and have not been included. (See Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF, ¶¶ 362 & 364.)

interview was the most impressive. All three panelists, however, agreed that Armstrong performed poorly during the interview process.

The first question asked of each interviewee was: "Tell us about your degree and how does that prepare you for this job." Armstrong responded that he had a bachelor's of business adminstration in finance and that he felt his work experience was most closely related to the position.

In response to the first interview question, Kraco stated that he had a bachelor's degree from the University of Indiana in photojournalism, which had helped him pay attention to details, keep good records, and become a good writer. Kraco also stated that his college and experience in construction made him a good candidate for the job. Kraco offered insightful responses, was engaged and talkative, and he made eye contact.

In 2000, Kraco initially worked for Neighborhood Services as a Code Enforcement I Inspector. Thereafter, he was promoted to Building Construction Inspector in the Condemnation section. Throughout his two-year employment in that position, Kraco demonstrated superior competency, initiative, good judgment, and excellent communication skills. For the 15-year period before he was employed by the city, Kraco worked in the construction field. He owned a construction company which built additions and modifications to residential and commercial buildings.

Collins agreed to promote Kraco, and Kraco accepted. Kraco was promoted because he was the most qualified candidate due to his past experience, his excellent interview,

technical experience, knowledge of codes and laws, and his demonstrated work ethic. Armstrong feels that he was more qualified than Kraco for the position.

### F. Alleged Retaliation

#### 1. Discipline Relating to November 8, 2001, Altercation with Blosmore

Armstrong believes that, as retaliation for having previously filed employment complaints, he was disciplined more harshly than his coworker, Blosmore, a Caucasian female, for a November 8, 2001, incident. On that date, Armstrong and Blosmore were engaged in a verbal altercation which was disrupting the office.[18] Candice Maynard ("Maynard"), the Residential Inspection Division Supervisor; Hutchinson, the Building Construction Inspection Assistant Supervisor; and James Morawetz ("Morawetz"), the Residential Code Enforcement Supervisor witnessed the altercation.

Morawetz told both Armstrong and Blosmore several times to stop fighting; they ignored him. Morawetz then ordered them to stop, but to no avail. Maynard then approached Armstrong and directed him to move into Hutchinson's office and directed Blosmore to move into a separate vacant office. Armstrong and Blosmore acquiesced.

In the vacant office, Maynard asked Blosmore what had transpired. Blosmore said that the dispute stemmed from Armstrong's request that she return his union booklet. After that, in Hutchinson's office and in Hutchinson's presence, Maynard asked Armstrong what happened. Armstrong stated that he was not angry and that he did not think that the incident had disrupted the office. Armstrong appeared agitated. Hutchinson told Armstrong that his perception was

---

[18]There is a genuine factual dispute as to whether Armstrong was yelling, but such dispute is not material.

Case 2:03-cv-00581-RTR   Filed 11/17/05   Page 30 of 53   Document 55

mistaken and that such an incident could not be repeated. Armstrong stated that he "was a man" and could not promise that the situation would not repeat itself. (Defs.' PFOF ¶ 265.) Hutchinson told Armstrong that his behavior and responses were unacceptable and that their meeting was finished. Twice, Hutchinson asked Armstrong to leave his office.

After interviewing Armstrong and Blosmore and discussing the incident with Hutchinson and Morawetz, Maynard suggested that Collins suspend both Armstrong and Blosmore for a single day of work. Maynard and Hutchinson believed that the one-day suspension was appropriate because Armstrong's and Blosmore's conduct showed a lack of regard for Morawetz's directive to cease fighting, and disregard for such an order was unprecedented and troubling to Hutchinson and Maynard. They felt Armstrong's and Blosmore's conduct was insubordinate, disruptive, and demonstrative of a lack of respect for authority, their fellow colleagues, and each other.

On November 14, 2001, Armstrong and Blosmore were issued identical one-day suspension notices for: "Failure to obey [a] lawful order or reasonable direction made and given by a superior officer, where such violation or failure to obey amounts to an act of insubordination or a serious breach of proper discipline," and for "offensive . . . conduct or language towards the public or towards city officers or employees." The one-day suspension was to be held in abeyance if the employee visited the Employee Assistance Program ("EAP") and followed the EAP coordinator's confidential recommendations. Armstrong chose to have his suspension held in abeyance and attended the EAP meeting. On February 27, 2002, the EAP coordinator

informed Neighborhood Services that Armstrong had completed the EAP recommended program. The nature or specifics of that program were not disclosed to Neighborhood Services.

Blosmore served her one-day suspension, but she also filed a grievance contesting the propriety of Neighborhood Services's action. At Blosmore's grievance disposition on January 22, 2002, Collins affirmed the Department's reasons for suspending Blosmore, but he determined that Neighborhood Services had not satisfied the contractual notice requirement because it had neglected to notify a union staff representative or liaison of the suspension. Collins "returned the day of suspension served" by Blosmore and removed all copies of the suspension notice and references to it from her personnel records. (Defs.' PFOF ¶ 280.)

On March 5, 2002, Armstrong's union representative requested that Armstrong's disciplinary action also be dismissed, relying upon Collins's decision regarding the procedural defect in the notices issued to Blosmore and Armstrong. The following day, on March 6, 2002, Collins agreed to Armstrong's request and rescinded the disciplinary action and removed it from Armstrong's personnel file.

### 2. *Warning for Inappropriate Use of Department E-Mail – March 2003*

On March 7, 2003, Armstrong sent an e-mail to his union, Neighborhood Services managers, two aldermen, and Collins criticizing a colleague's abilities and challenging her possible promotion. That same day, Collins responded informing Armstrong that the e-mail demonstrated a lack of judgment and was a misuse of the City's computer e-mail system, because of the e-mail's recipients and contents. Collins directed Armstrong to cease such usage of the e-mail system. Collins told Maynard to issue a written warning to Armstrong.

On March 17, 2003, Maynard issued a written warning to Armstrong regarding the inappropriate e-mail. A written warning is not considered a disciplinary action under the agreement between Milwaukee and Armstrong's union representative, Milwaukee District Council 48 AFSCME, AFL-CIO. (Collins Aff. ¶ 98, Ex. K (*Agreement Between Milwaukee and Milwaukee District Council 48 AFSCME, AFL-CIO*, Cover & p. 14).)  Armstrong did not have any loss as a result of the warning. The Neighborhood Services's policy regarding use of computers and e-mail states that the e-mail system, the Internet, and other computer capabilities are to be used for work-related purposes only.

### 3. Maynard's Close Scrutiny of Armstrong – 2000 through 2003

Armstrong alleges that he was subjected to closer work supervision while Maynard was his supervisor from 2000 through 2003.[19] Armstrong complains that he was relocated twice in 2002. Armstrong alleges that, with Maynard as his supervisor, he did not receive his preferred work schedule and Maynard did not seem satisfied with his work.

Armstrong did not allege that his work was more closely scrutinized in ERD Charge No. 200101509 and EEOC Charge No. 260A10758, ERD Charge No. 200200554 and EEOC Charge No. 26GA200753, or ERD Charge No. 200303729 and EEOC Charge No. 26G-2003-02076.

In February 2000, Maynard became the Supervisor of the Residential Inspection division. During that month, as the result of the promotion of another individual, Maynard

---

[19]There is a genuine factual dispute regarding whether Maynard was Armstrong's **immediate** supervisor between 2000 and 2002. Maynard avers that she became Armstrong's supervisor in February 2000. (Maynard Aff. ¶ 6.)  Armstrong avers that Maynard was not his immediate supervisor from 2000 through 2002; rather, at that time, Maynard was his supervisor's supervisor. (Armstrong Aff. ¶ 12.)  This factual dispute is not material.

reassigned Armstrong to work at the complaint desk. The reassignment required Armstrong to relocate to another part of the building. Armstrong did not express any dissatisfaction with the move to Maynard.

Several months after the section moved to a new location at Lake Tower, Maynard wanted to separate two employees who were having compatibility problems and requested that Armstrong switch work cubicles.[20] Armstrong complied without voicing any complaint to Maynard.

As the Supervisor of the Residential Inspection division, Maynard assumed a hands-on approach. Maynard implemented changes and required "more accountability" from the inspectors to justify the time required "to close open orders." (Defs.' PFOF ¶ 310.) Maynard requested and reviewed the inspectors' monthly orders and provided feedback to each inspector regarding the changes she expected.

Maynard reviewed computer data on the district workload, open orders, and all extensions granted to owners and landlords to abate emergency orders. Maynard's goal was to significantly reduce the number of extensions given by inspectors to noncompliant property owners and landlords. Maynard discussed these issues with Armstrong. Maynard advised Armstrong that she was supervising all inspectors and that she intended to run the Residential Division with greater oversight.[21]

---

[20]Armstrong opposes this proposed finding of fact asserting that Maynard "ordered" him to move. (Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF ¶ 300 (citing Armstrong Dep. at 164).) The cited deposition page is not included in the factual materials on file with the Court. *See* Fed. R. Civ. P. 56(c). Therefore, Armstrong has failed to raise a factual dispute as to Defs.' PFOF ¶ 300.

[21]There is a factual dispute as to whether Maynard treated Armstrong differently from any other inspectors. *See* Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF, ¶ 316. This dispute is not material because, as will be further explained, the greater scrutiny retaliation claim is not properly before the Court.

In April 2001, Maynard began noticing that Armstrong's case load had a number of overdue orders. Armstrong had given an excessive number of extensions to noncompliant property owners and landlords. In some instances, Armstrong was taking six months to process emergency orders that he should have completed in 30 days. Maynard also noticed that the quality of Armstrong's writing needed improvement. Collins had reviewed one of Armstrong's reports and wrote a note to Maynard that she should discuss the report's shortcomings and the timeliness of Armstrong's processing of orders with Armstrong.

Regarding KANDO (Kaul Avenue Neighborhood Development Organization), Armstrong had been assigned to cover a specific area of the city and work with landlords and neighbors to obtain code compliance.[22] Maynard was concerned about incomplete information included in the KANDO report which was disseminated both inside and outside of the Department. Maynard worked with Armstrong on several occasions, editing his reports and discussing her suggestions for improving his reporting. When the KANDO report showed no improvement and after discussion with Collins, Maynard decided to discontinue the report. Maynard assigned oversight of KANDO to the district inspector.

In about April or May 2002, Maynard became aware that Armstrong was working an unapproved work schedule and was reporting time-off as "time owed." Maynard indicated that the Neighborhood Services did not permit its employees to claim "time off as 'time owed.'"

---

[22]Armstrong opposes the Defendants' proffered facts regarding KANDO. Armstrong maintains that he worked on the project from its inception to its conclusion and that the work was not assigned to other inspectors because of Maynard's concerns regarding the quality of Armstrong's work. (See Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF, ¶ ¶ 321-326.) Armstrong relies upon his averment that his resume is attached to his affidavit as Exhibit A. *See Id*. However, he does not attest to the truthfulness of his resume's contents. The unsworn representations in Armstrong's resume do not create a genuine issue of fact as to Armstrong's involvement with KANDO. *See Friedel*, 832 F.2d at 969-70. Thus, the Defendants' facts regarding KANDO are undisputed for summary judgment purposes.

(Defs.' PFOF ¶ 304.)  Maynard told Armstrong that the Neighborhood Services's management needed to know when Armstrong was working and that he had to cease setting his own daily schedule.  Maynard advised Armstrong that he would be required to abide by the same "time-off" options afforded to all other employees.  Like his coworkers, Armstrong could work a flexible schedule, but he would be required to adhere to Neighborhood Services's procedures.

### G. Other Facts

On December 10, 2003, Armstrong was transferred to the Commercial Inspection Division in the downtown office to cross-train as a Special Enforcement Inspector in the areas of commercial code enforcement, zoning, and condemnation.

As of August 30, 2004, there were about 185 Neighborhood Services's employees, 43 of whom were African Americans.  Two African American employees were within the supervisor level and no African American employee had a position above the supervisory level.

## IV. ANALYSIS

### A. Proper defendants

The Defendants contend that Neighborhood Services is not a proper party to this action because it is not a legal or suable entity and that it is not an "employer" under Title VII.  Other than maintaining that he considers Neighborhood Services as his employer, Armstrong not responded to this contention.  *See* Pl.'s Resp. to Defs.' PFOF and Pl.'s Add'l PFOF  ¶ 10.

Pursuant to Rule 17(b) of the Federal Rules of Civil Procedure, state law controls on the question of whether an entity has the capacity to be sued.  Fed. R. Civ. P. 17(b); *see also*,

*Grow v. City of Milwaukee*, 84 F.Supp. 2d 990, 995-96 (E.D. Wis. 2000). Under Wisconsin state law, the City of Milwaukee Neighborhood Services Department is not an entity subject to suit. *See Id.* (concluding that the City of Milwaukee Police Department was not a proper party defendant); *see also*, Wis. Stat. § 62.25 (explicitly authorizing a suit to be maintained against a city and lacking any authorization to maintain a suit against a city department).

Furthermore, Armstrong's discrimination and retaliation claims arise under Title VII of the United States Code which makes it unlawful for an employer to ". . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Although Armstrong has named Milwaukee and Neighborhood Services as defendants, it is undisputed that at all relevant times, Armstrong's employer was Milwaukee. Since Neighborhood Services was not Armstrong's employer, his claims against Neighborhood Services are dismissed. *See Robinson v. Sappington*, 351 F.3d 317, 332 n.1 (7th Cir. 2003), *cert. denied*, 542 U.S. 937 (2004); *Williams v. Banning*, 72 F.3d 552 (7th Cir. 1995).

### B. Hostile Work Environment

The Defendants seek summary judgment on any hostile work environment brought by Armstrong because he did not raise the claim in his filings with the EEOC and ERD. Armstrong has not responded to this contention.

As applicable to this case, Title VII provides that a charge of racially discriminatory employment practices shall be filed with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge with

–37–

the EEOC precludes a subsequent lawsuit under Title VII. *Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 860 (7th Cir. 2005) (citing *Martinez v. United Autoworkers, Aerospace & Agricultural Implement Workers of America, Local 1373*, 772 F.2d 348, 350 (7th Cir. 1985)).

A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if his allegations fall within the scope of the charges contained in the EEOC complaint. *Harper v. Godfrey Co.*, 45 F.3d 143, 147-48 (7th Cir. 1995). In determining whether the current allegations fall within the scope of the earlier charges, the Court looks at whether they are "like or reasonably related to" those contained in the EEOC complaint. *Id.* If they are, the Court then asks whether the current claim reasonably could have developed from the EEOC's investigation of the charges before it. *Id.* For example, ordinarily a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination. *Cheek[23] v. W. and S. Life Ins. Co.*, 31 F.3d 497, 503 (7th Cir. 1994).

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). An actionable hostile environment claim requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for

---

[23]The name of the plaintiff in the action was "Loretta" Cheek.

employer liability.  *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998)).

The allegations in Armstrong's EEOC complaints asserted multiple failures to promote, and retaliation in the form of discrete incidents and failures to promote.  Such allegations do not advert to an abusive working environment.  Not having raised a hostile work environment claim before the EEOC, Armstrong may not bring such a claim in this Title VII action.  *See Cheek*[24] *v. Peabody Coal Co.*, 97 F.3d 200, 202-03 (7th Cir. 1996) (citing *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1003 (7th Cir. 1994).)  Therefore, any hostile work environment claim of Armstrong is dismissed.  *See Beamon*, 411 F.3d at 860-61.

### C.  *Failure to Promote*

A plaintiff may prove intentional discrimination under Title VII  through direct or circumstantial evidence (direct method) or resort to the familiar indirect burden-shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Dandy*, 388 F.3d at 272.  In his brief. Armstrong states that he does not have direct or circumstantial evidence of intentional discrimination, and that instead, he proceeds under the indirect method of proof of the *McDonnell Douglas* burden-shifting approach.  (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. at 7.)

Establishing a *prima facie* case of discrimination based upon a failure to promote requires that Armstrong prove that: (1) he is a member of a protected class; (2) he had the requisite qualifications for promotion; (3) he was denied the promotion; and, (4) a member of the

---

[24]The name of the plaintiff in the action was "Janet" Cheek.

non-protected class who was not better qualified was promoted instead. *Dandy*, 388 F.3d at 273-74.

If Armstrong establishes a *prima facie* case, then Milwaukee has the opportunity to articulate a legitimate, nondiscriminatory reason for its decision not to promote Armstrong. *See Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005). A subjective reason can constitute a legally sufficient, legitimate nondiscriminatory reason under the *McDonnell Douglas* analysis. *See Millbrook*, 280 F.3d at 1176. "Subjective evaluations of a job candidate are often critical to the decisionmaking [sic] process, and if anything, are becoming more so in our increasingly service- oriented economy." *Id*. (citation omitted.)

If Milwaukee presents such a reason, then Armstrong may show that the articulated reason is just a pretext for race discrimination. *Blise*, 409 F.3d at 867. Under the indirect method of proof, a plaintiff may show that the defendant's proffered explanation is not worthy of credence. *Id*. In other words, "[a] pretext for discrimination . . . means something worse than a business error; pretext means deceit used to cover one's tracks." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) (quoting *Grube v. Lau Indus., Inc.,* 257 F.3d 723, 730 (7th Cir.2001)). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Davis*, 368 F.3d at 784 (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).) In order to show pretext, moreover, the plaintiff must specifically rebut each legitimate, non-discriminatory reason given by the defendants for their decision. *See McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir.1992).

*1. Senior Housing Rehabilitation Specialist – December 2000*

As an African American, Armstrong is a member of a protected class. With respect to the Senior Housing Rehabilitation Specialist promotion of December 2000, Armstrong was qualified for the position having ranked fifth on the certified eligibility list based on his performance on the job examination. Furthermore, he was denied the promotion. Thus, Armstrong has satisfied the first three prongs of a *prima facie* case of race discrimination.

However, Armstrong has not presented evidence that Skiba was not better qualified for the position – the fourth prong of a *prima facie* case. While Armstrong feels he was more qualified for the position, Skiba, who was selected for the promotion, ranked third on the examination. The interview panel also decided that Skiba was the best interviewee.

Furthermore, the position of Senior Housing Rehabilitation Specialist involves working with homeowners and contractors to rehabilitate homes as a part of federally funded Milwaukee's housing rehabilitation program. Unlike Armstrong, Skiba had extensive construction and finance experience. Skiba had ten years of experience working for the Community Block Grant Agency, which included managing Milwaukee's housing rehabilitation program, and had experience in the private construction industry, which included managing a nonprofit housing rehabilitation program. Additionally, Skiba had experience as a loan officer and as a construction business owner and operator. Armstrong lacked experience as a loan officer, contractor and business owner and has not presented evidence that he was better qualified than Skiba for the position of Senior Housing Rehabilitation Specialist. Therefore, Armstrong has not established a *prima facie* case as to that position.

-41-

Moreover, even if the analysis of such claim proceeded, Neighborhood Services has presented a legitimate nondiscriminatory reason for Skiba's promotion. The Department concluded that he was the best interviewee and the most qualified for the position based upon his experience in the construction and housing related finance fields. Armstrong has failed to present evidence indicating that Neighborhood Services's reasons for Skiba's promotion were not the real reason for promoting Skiba. Armstrong has not presented any evidence upon which a reasonable jury could conclude that all of Neighborhood Services's reasons for selecting Skiba for the promotion to Senior Housing Rehabilitation Specialist were deceitful. *See Millbrook*, 280 F.3d at 1175. Thus, such Armstrong's discrimination claim, with respect to the denial of such promotion, is dismissed upon summary judgment.

*2. Assistant Supervisor for Commercial Code Enforcement– January 2001*

As to the position of Assistant Supervisor for Commercial Code Enforcement, Armstrong has presented evidence which satisfies the first three prongs of a *prima facie* case of race discrimination under the *McDonnell-Douglas* indirect method of proof. He is African American, he was qualified for the position and he was denied the promotion. However, Armstrong has not presented evidence that he was better qualified for the position than Jacobs.

In selecting a managerial employee, Milwaukee considers the relevance and quality of the candidate's experience as well as their performance and accomplishments. The length of the employee's tenure with Neighborhood Services is not a factor in the selection of the most qualified person for the position. Therefore, Armstrong's lengthier term of employment by Neighborhood Services was not relevant to the promotional decision. Jacobs was selected for

the managerial position based on her superior interview performance and her prior experience the Department including an established history of innovation and initiative. Armstrong has not presented evidence of a superior, or even comparable, history of innovation or initiative within the Department. As such, Armstrong has not established a *prima facie* case of race discrimination with respect to the Assistant Supervisor for Commercial Code Enforcement position.

Moreover, if Armstrong had established a *prima facie* case, Milwaukee has presented a legitimate nondiscriminatory reason for selecting Jacobs for the position. She was the best interviewee and had the most impressive past experience. Even if Milwaukee's judgment was in error, Armstrong has not presented any evidence indicating that Neighborhood Services's reasons for selecting of Jacobs for the promotion were not the true reasons for her promotion. *See Millbrook*, 280 F.3d at 1175. Therefore, the racial discrimination claim is dismissed on summary judgment.

Jacobs, a woman, was selected for the promotion rather than Armstrong, a male. However, Armstrong has not responded to the Defendants' arguments that he has presented no evidence of sex discrimination. This Court's role does not include making arguments on behalf of parties. *See, e.g., Spath v. Hayes Wheels Int'l-Ind. Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). At this stage of the proceedings, a plaintiff must present evidence upon which a reasonable jury could find that he is entitled to relief. *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1111 (7th Cir. 2004) ("Summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of

events.'" (citations omitted)). Armstrong has not rebutted the Defendants' contention that he has not presented any evidence of sex discrimination. Thus, to the extent that Armstrong's claim with respect to the Assistant Supervisor for Commercial Code Enforcement position includes a claim of sex discrimination, that claim is also dismissed.

### 3. Commercial Code Enforcement Supervisor – February 2003

As an African American, Armstrong satisfies the first prong of a *prima facie* case. However, Armstrong has failed to establish the second prong of a *prima facie* case; that is, that he was qualified for the promotion to the Commercial Code Enforcement Supervisor position. The opportunity for a promotion was only open to those holding supervisory or assistant supervisory positions. At the time, as a Special Enforcement Inspector, Armstrong was not a supervisor or assistant supervisor. Therefore, Armstrong did not fit within the eligibility parameters for the position. Armstrong has failed to establish a *prima facie* case with respect to his discrimination claim regarding the February 2003 Commercial Code Enforcement Supervisor promotion.

Even if Armstrong had done so, Milwaukee has established that Roberts was selected because he was the best of the interviewees. Roberts had extensive experience with all Neighborhood Services sections, comprehensive knowledge of applicable laws, excellent writing skills and worked well with staff, and persons involved in condemnation matters – property owners, contractors and business operators. Armstrong has not presented evidence discrediting or casting doubt upon Milwaukee's reasons for choosing Roberts for the position. Consequently,

Armstrong's claim based upon February 2003 Commercial Code Enforcement Supervisor is dismissed upon summary judgment.

   4.  *Building Construction Inspection Assistant Supervisor for Condemnation Services-*
*April 2003*

            As to the Building Construction Inspection Assistant Supervisor for Condemnation Services position, Armstrong meets the first three prongs of a *prima facie* case. He is a member of a protected class, he was qualified for the position, and he was denied the promotion.

            However, Armstrong has failed present evidence that he was more qualified than Kraco, the white male selected for promotion. The position required a comprehensive understanding of construction methods, building materials and the condemnation process as well as zoning violations. The position also required strong communication and writing skills. Three interview panel members ranked Kraco's interview performance as ranked significantly better than Armstrong's interview performance. Armstrong has not presented evidence that he had superior competency, initiative, good judgment and excellent communication skills. Unlike Kraco, Armstrong did not have experience in the construction industry. Furthermore, Armstrong has not presented evidence that he had a strong knowledge of the applicable codes and laws which compared favorably to or exceeded that of Kraco. Armstrong has not presented evidence that his qualifications for the position exceeded those of Kraco. Thus, as to this position, Armstrong has failed to establish a *prima facie* case of race discrimination.

            Moreover, even if Armstrong had established a *prima facie* case, the Defendants have articulated a legitimate nondiscriminatory reason for selecting Kraco. They believed that he was the best candidate for the job based on a variety of factors. Of the seven interviewees, Kraco

-45-

was ranked first by two of the interviewers and third by another. Kraco was promoted because he was the most qualified candidate based on his past experience, his excellent interview, technical experience, and his knowledge of the relevant codes and laws. Through his work as a Neighborhood Services employee Kraco had demonstrated an excellent work ethic. Armstrong has not presented evidence suggesting that the Defendants' articulated reasons for selecting Kraco are untrue. *See Millbrook*, 280 F.3d at 1175. Therefore, Armstrong's failure to promote claim with respect to the April 2003, Building Construction Assistant Supervisor for Condemnation Service is dismissed upon summary judgment.

### C. Retaliation

Armstrong's complaints include three retaliation claims. The Defendants seek dismissal of each of those claims.

#### 1. Closer Scrutiny by Maynard

With respect to Armstrong's claim that in retaliation for his filing of discrimination charges, Maynard scrutinized his work more closely than the work of others whom she supervised, the Defendants contend that such claim must be dismissed because it was not included in his EEOC charges. Armstrong has not responded to this argument.

A plaintiff may not bring claims in a lawsuit that were not included in his EEOC charge. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 476-77 (7th Cir. 1999); *Cheek*, 97 F.3d at 202. A claim falls within the scope of the EEOC complaint if it is "like or reasonably related to" the charges in the EEOC

complaint and if it "reasonably could have developed from the EEOC's investigation of the charges before it." *Cheek*, 97 F.3d at 202.

Armstrong's administrative discrimination charge did not include any allegations of Maynard's retaliation against him by subjecting his work to greater scrutiny. Only in those cases where claims not explicitly set forth in an EEOC complaint "reasonably could be expected to grow out of an EEOC investigation of the [initial EEOC] charge" can this inference be made. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002). This requirement serves to enhance the administrative enforcement process by ensuring that the EEOC can conduct a full investigation while also providing the employer with advance notice of the claim and an opportunity to resolve the dispute. *See Harper*, 45 F.3d at 148; *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544 (7th Cir. 1988).

While Armstrong's EEOC charges included claims of retaliation, they were based on two specific incidents and the Defendants' failure-to-promote Armstrong. An investigation of an ongoing campaign of greater scrutiny by Maynard over a three-year period could not reasonably be expected to grow out of the EEOC's investigation of Armstrong's administrative charges. Maynard was involved in the discipline relating to the November 8, 2001, altercation between Blosmore and Armstrong which Armstrong alleged was retaliatory. However, that was an isolated incident which was not linked with any other retaliatory conduct by Maynard. Therefore, Armstrong may not proceed on third retaliation claim and that claim is dismissed upon summary judgment.

*2. Discipline Relating to November 8, 2001, Altercation with Blosmore*

To state a claim of retaliation, Armstrong must prove: (1) that he engaged in statutorily protected activity; (2) that he sustained an adverse employment action; and (3) a causal link between the protected activity and the employer's action. *See Dandy*, 388 F.3d at 274-75. The standards for actionable adverse action for discrimination claims under § 2000e-2(a) and retaliation claims under § 2000e-3(a) are not identical. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). "Section 2000e-3(a) is 'broader' than § 2000e-2(a) in the sense that retaliation may take so many forms, while § 2000e-2(a) is limited to discrimination 'with respect to [the worker's] compensation, terms, conditions, or privileges of employment.'" *Id.* (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005).) In the retaliation context, an employer's action will be actionable under § 2000e-3(a) if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Washington*, 420 F.3d at 662.

As with race discrimination claims, retaliation claims under Title VII can be proven either directly or indirectly. To establish a claim of retaliation under the indirect method of *McDonnell Douglas*, a plaintiff must establish that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Whittaker*, 424 F.3d at 647 (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002).) Thereafter, the familiar burden-shifting approach again takes hold, requiring the defendant to come up with a

noninvidious reason for the adverse action." *Id.* (quoting *Stone*, 281 F.3d at 644). If it does so, the plaintiff may survive summary judgment only by presenting sufficient evidence that the defendant's justification is pretextual. *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.,* 243 F.3d 336, 344 (7th Cir. 2001).

With respect to the altercation between Armstrong and Blosmore, Armstrong had engaged in protected activity – he previously filed administrative charges of discrimination. The one-day suspension notice is arguably an adverse employment action. *See Silk v. City of Chi.,* 194 F.3d 788, 800-01 (7th Cir. 1999) (holding that the defendant's refusal to allow the plaintiff to pursue secondary employment and five-day suspension could be considered adverse employment actions); *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir.1999) (treating a one-week suspension as an adverse employment action).

However, a one-day suspension notice was issued to both Armstrong and Blosmore based on their involvement in the argument and insubordination. The notices were identical. Both Armstrong and Blosmore had the same options with respect to the consequences of the suspension notices – each could either serve the suspension and/or file a grievance, or to meet with an EAP counselor and complete a recommended EAP program in lieu of serving the suspension. Although Armstrong points to the fact that he was required to complete the EAP program, that difference resulted from Armstrong's **own choice** as to the consequence of one-day suspension notice — not from any difference in Milwaukee's discipline of him vis-a-vis Blosmore. Furthermore, the disparity in the timing of the eventual removal of the suspension notice stemmed from the differences in the recourse chosen by Blosmore and Armstrong. Upon

Armstrong's request, the suspension and evidence of it was promptly removed from his file. Armstrong has not demonstrated that he, and not any similarly situated employee who did not file a charge was, subjected to an adverse employment action. *See Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 732-33 (7th Cir. 2004.) Armstrong has not presented a *prima facie* case of retaliation. Therefore, Armstrong's retaliation claim based on the November 8, 2001, altercation with Blosmore is dismissed upon summary judgment.

### 2. *Warning for Inappropriate Use of Department E-Mail – March 2003*

Armstrong also maintains that the warning he was given in March 2003, for improper use of e-mail was issued in retaliation for his protected activity. Having filed complaints of discrimination, Armstrong satisfies the first element of a retaliation claim. However, the warning that Armstrong received does not constitute an adverse employment action. *See Whittaker*, 424 F.3d at 648 (plaintiff's negative evaluation, written warnings, and placement on "proof status" were putatively disciplinary measures, but none resulted in tangible job consequences and therefore were not adverse employment actions actionable under Title VII); *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002) (holding that plaintiff's "negative performance evaluations and being required to substantiate that her absences from work were illness-related . . . did not result in tangible job consequences and therefore are not adverse employment actions actionable under Title VII"); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (holding that neither "unfavorable performance evaluations" nor "oral or written reprimands" constitute adverse employment actions under circuit case law). There is no indication that the warning Armstrong received resulted in some negative change in

employment terms or status. Armstrong has not established a *prima facie* case with respect to this retaliation claim. Therefore, Armstrong's retaliation claim based on the March 2003, warning is dismissed upon summary judgment.

### V. SUMMARY

Armstrong has not established that there is a genuine issue of material fact for trial on his claims of discrimination and/or retaliation. Armstrong has forfeited a number of his claims by failing to present them in timely administrative charges. Furthermore, as to each of Armstrong's failure-to-promote claims which are properly before the Court, he has not presented sufficient evidence to establish a *prima facie* case of race discrimination. Likewise, as to those retaliation claims which are properly before the Court, Armstrong has failed to present a *prima facie* case. Therefore, the Defendants' motion for summary judgment dismissing all of Armstrong's claims is granted and these actions are dismissed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The Defendants' motion for summary judgment (Docket No. 24) **DISMISSING** all of Armstrong's Title VII claims and these actions is **GRANTED**, for the following reasons:

(1) Armstrong's claims against Neighborhood Services are dismissed because it is not a proper defendant in these actions;

(2) Armstrong's Title VII hostile work environment claim and his Title VII retaliation claim based on being subjected to closer scrutiny by Maynard are dismissed because those claims were not included in Armstrong's EEOC charges;

(3) Armstrong's Title VII racial discrimination claims based on Milwaukee's failure to promote him to the positions of (a) Senior Housing Rehabilitation Specialist in December 2000; (b) Assistant Supervisor for Commercial Code Enforcement in January 2001; (c) Supervisor for Commercial Code Enforcement in February 2003; and, (d) Building Construction Supervisor for Condemnation Services in April 2003, are dismissed because Armstrong has failed to present sufficient evidence of discrimination;

(4) Armstrong's claim of sex discrimination based on Milwaukee's failure to promote him to the position of Assistant Supervisor Commercial Code Enforcement in January 2001 is dismissed because Armstrong has not responded to the Defendants's arguments that he has not presented any evidence of sex discrimination; and,

(5) Armstrong's Title VII claims of retaliation based on discipline relating to the November 8, 2001, altercation with Blosmore and the warning for inappropriate use of e-mail in March 2003, are dismissed because Armstrong has failed to present evidence to establish a *prima facie* case as to those claims.

These actions are **DISMISSED**; and,

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 17th day of November, 2005.

**BY THE COURT**

**s/ Rudolph T. Randa**

_____

**Hon. Rudolph T. Randa**
**Chief Judge**